IN THE U.S. DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| ADAM KEITH PEDERSEN, | ) |
|     Petitioner, | ) ) ) |
| and | )   No. |
| COLLETTE RENEE SHRIVER, | ) ) ) |
|     Respondent. | ) |

**VERIFIED COMPLAINT AND PETITION FOR
RETURN OF MINOR CHILD**

NOW COMES the Petitioner, ADAM KEITH PEDERSEN, by and through his attorneys, LAKE TOBACK DiDOMENICO, pursuant to The International Child Abduction Remedies Act (22 U.S.C.A. § 9001, et seq.) and in support of his Verified Complaint and Petition for Return of Minor Child, respectfully states to this Court as follows:

**I. INTRODUCTION**

1. This action is brought by ADAM KEITH PEDERSEN ("Adam"), a citizen of Australia, to secure the return of his minor child, R.P., born May 27, 2018, in Australia.

2. R.P. was, without Adam's consent or acquiescence, wrongfully removed to and retained in the Northern District of Illinois by the minor child's mother, COLLETTE RENEE SHRIVER ("Collette"), who is a citizen of the United States of America and a permanent resident of Australia.

3. This Petition is filed pursuant to the Convention on the Civil Aspects of International Child Abduction (the "Hague Convention" or the "Convention")[1] and the International Child

---

[1] Oct. 25, 1980, T.I.A.S. No. 11,670 at 1,22514 U.N.T.S. at 98, reprinted in 51 Fed. Reg. 10494 (1986).

Abduction Remedies Act ("ICARA").[2] The Hague Convention came into effect in the United States of America on July 1, 1988, and has been ratified between, among other contracting states, the United State of America and Australia.

4. The objectives of the Hague Convention are:

Article 1(a): To secure the prompt return of children wrongfully removed to or retained in any Contracting State; and

Article 1(b): To ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States.

5. The Hague Convention authorizes a court to determine the merits of a claim for the wrongful removal or retention of a child; it does not, however, allow a court to consider the merits of any underlying custody dispute.

## II. JURISDICTION AND VENUE

6. This Court has jurisdiction over this case pursuant to 22 U.S.C. § 9003(a), which confers jurisdiction to federal courts to hear cases brought under the Hague Convention and 28 U.S.C. § 1331, which conveys jurisdiction to federal courts to hear cases that present a question of federal law. Venue is proper under 22 U.S.C. § 9003 and 28 U.S.C. § 1391(b) because, upon information and belief based on confirmation from the Woodstock Police Department, the minor child and Collette are residing in the Eastern Division of the Northern District of Illinois at 1312 Oakview Terrace, Woodstock, Illinois 60098.

## III. STATEMENT OF FACTS

7. Adam and Collette are the natural parents of the minor child, R.P., born May 27, 2018, (age 5). The minor child was born in St. Albans, Victoria, Australia. A copy of the child's Australian birth certificate is attached hereto as **Exhibit A.**

---

[2] 22 U.S.C. §9001-11 (2014)

8. Because Collette is a citizen of the United States, R.P. obtained United States citizenship by virtue of Collette's citizenship status. A copy of the child's United States birth certificate is attached hereto as **Exhibit B**.

9. The parties met in Australia in 2017, while Collette was living in Melbourne, Victoria, Australia on a working visa and working as a hairdresser.

10. Adam and Collette were married on September 23, 2017, in Sydenham, Victoria, Australia, approximately nine weeks after meeting. The parties discovered that they were pregnant with R.P. around the time of the wedding. A copy of the parties' marriage certificate is attached hereto as **Exhibit C**.

11. R.P has been a habitual resident of Australia since the time of his birth.

12. R.P. has a robust social and familial network in Australia. The minor child was set to begin kindergarten in February of 2023 and grade school in January 2024 in Australia.

13. R.P. struggles with language and speech delays and was supported by an occupational therapist (Ms. Samantha Thatcher at Baobab Therapy) and speech therapist (Ms. Maddy Chiu at Little Birds Speech Therapy) funded by the National Disability Insurance Scheme in Australia.

14. R.P. was also regularly seen and treated by a pediatrician, Dr. Luke Sammartino of Northern Pediatric Clinic, of Victoria, Australia.

15. The parties' marriage was tumultuous, and Collette often expressed that she was not happy in Australia.

16. On or about November 26, 2019, the parties separated, which resulted in subsequent litigation in Australia as related to R.P.

17. With Adam's agreement, Collette took R.P. on a visit to Chicago, Illinois, USA from November 6, 2019, to January 5, 2020.

18. During this trip, Collette arranged for R.P. to receive a Birth Abroad Certificate and a United States passport, both of which were issued on February 4, 2020.

19. Following the parties' separation, Collette attempted to live independently and moved into a local shared accommodation in Victoria, Australia with R.P.

20. Adam moved in with his mother in Victoria, Australia.

21. Adam continued to support Collette financially, and he and his mother assisted heavily with R.P.'s daily care and maintained a strong presence in his life.

22. Adam had overnight parenting time with R.P. every Wednesday through Friday and alternating weekends by informal agreement of the parties.

23. Despite the support from Adam and his mother, Collette experienced difficulties living independently and failed to create a safe environment for R.P. in the shared accommodation.

24. Around this time, Collette began expressing a desire to return to the United States to live with her mother in her home in Woodstock, Illinois.

25. On June 6, 2020, Collette and R.P. moved in with Adam and his mother in Sydenham, Victoria, Australia.

26. Adam was working full-time as a laborer and Collette was unemployed, having lost several hair salon jobs.

27. On September 24, 2020, Collette made the first of many false reports against Adam for family violence to the Child Protection division of the Department of Families, Fairness, and Housing ("DFFH").[3]

---

[3] DFFH is akin to the Department of Children and Family Services in Illinois.

28. DFFH investigated and determined that there were no concerns regarding Adam's behavior towards R.P. and his parenting abilities.

29. However, DFFH determined that R.P. was "at risk of emotional harm whilst in the care of his parents (Ms. Shriver and Mr. Pedersen) due to his exposure to the verbal arguments between his parents and the effect of the ongoing conflict in the home had on both Ms. Shriver and Mr. Pedersen's parenting capacity." A copy of DFFH's report is attached hereto as **Exhibit D**. *See* page 3, **Exhibit D**.

30. On October 1, 2020, Collette received confirmation of her Australian permanent residency, and the next day she took R.P. without notice and moved to an accommodation provided by an Australian family violence service.

31. Collette withheld R.P. from Adam from October 2, 2020, to November 20, 2020, ignoring Adam's pleas to see R.P. and letters from Adam's attorneys.

### *Collette's Application for a Family Violence Intervention Order*

32. On October 15, 2020, Collette applied for a Family Violence Intervention Order (akin to a domestic violence order of protection) against Adam in the Werribee Magistrate's Court. Collette listed herself and R.P. as protected parties.

33. On October 28, 2020, Collette obtained an *ex parte* Invention Order against Adam. The Intervention Order application was heard in Adam's absence and without him having been served a copy of the application.

34. On October 26, 2020, DFFH informed Adam that, because of Collette's allegations of abuse, for his parenting time with R.P. to resume, it would have to be professionally supervised by a DFFH employee.

35. On October 30, 2020, Adam filed his initiating application and corresponding affidavit in the Federal Circuit Court of Australia, initiating a custody case in what is now the Federal Circuit and Family Court of Australia ("the Family Court"). A copy of Adam's initiating application is attached hereto as **Exhibit E**. A copy of Adam's corresponding affidavit is attached hereto as **Exhibit F**.

36. In his affidavit, Adam illustrated Collette's extreme mood swings, erratic behavior, substance abuse, and abusive behavior towards Adam. He expressed fears that Collette would kidnap R.P. to the United States. *See* pages 3-6, 16-19, 21-23, **Exhibit F**.

37. On November 20, 2020, Adam began having one-hour weekly visitation sessions with R.P. which were supervised by DFFH.

38. During Adam's supervised parenting time, DFFH described him as warm, loving, affectionate, attentive to R.P.'s needs, and enjoyed participating in R.P.'s activities. *See* page 3, **Exhibit D**.

39. On February 9, 2021, DFFH determined that supervised visits were no longer required for Adam.

40. However, Collette would not agree to allow Adam to have parenting time with R.P. As a result, Adam did not exercise parenting time with R.P. from February 5, 2021, to March 21, 2021, as Collette withheld parenting time.

41. On March 24, 2021, the Family Court of Australia entered an order allowing Adam to spend 7-hour weekly parenting time sessions with R.P., supervised by Adam's aunt. The order also allowed Adam to have regular weeknight FaceTime calls with R.P. A copy of the March 24, 2021, order is attached hereto as **Exhibit G**.

42. The March 24, 2021, order also contained an injunction prohibiting both parties from leaving Australia with R.P. *See* page 5, **Exhibit G**.

43. On April 16, 2021, the Family Court of Australia entered an order further increasing Adam's weekly parenting time with R.P., incorporating an alternating overnight weekend schedule. With the exception of the first two overnight weekends, the order no longer required that Adam's parenting time be supervised. A copy of the April 16, 2021, order is attached hereto as **Exhibit H**.

44. The April 16, 2021, order also required Collette to undergo a psychological assessment. *See* page 4, **Exhibit H**.

45. On August 12, 2021, the court entered an order setting a four-day trial to commence on July 19, 2022, during which issues related to R.P.'s best interests and care would be determined. Specifically, Collette asked the court for leave to relocate to the United States with R.P., which Adam opposed.

46. On January 14, 2022, the Family Court of Australia entered an order asking that DFFH prepare a report in relation to the parties and R.P.

47. On April 14, 2022, DFFH issued its report ("the Report"). The Report revealed that between April 12, 2021, and April 4, 2022, Collette made no fewer than seven accusations to Child Protection regarding alleged abuse by Adam. All of these cases were closed without a finding of abuse by Adam. See page 6, **Exhibit D**.

48. The Report stated that, as of November 11, 2021, Child Protection assessed Collette as "responsible for emotional harm" to R.P. See page 5, **Exhibit D**.

49. DFFH determined that Collette had been shown on numerous occasions to coach R.P. and continued to make serious false claims against Adam. DFFH expressed concern for R.P.'s ongoing exposure to Collette's poor mental health. *See* page 5, **Exhibit D**.

50. The Report concluded:

**Protective Assessment**

Child Protection have received 7 reports in relation to [R.P.] since 2020 with the most recent investigated in November 2021/January 2022. During this investigation it was assessed there was sufficient safety in place for [R.P.] in the care of his parents, Mr. Pedersen and Ms. Shriver. Child Protection was conscious of the malicious reporting and allegations put forth regarding Mr. Pedersen's care of [R.P.], including physical abuse, sexual abuse and family violence. Child Protection had completed an investigation regarding these allegations and assessed there is no significant or imminent risk of harm to [R.P.] in relation to this. **Child Protection assessed Ms. Shriver as responsible for harm given her ongoing impact on [R.P.]'s emotional wellbeing, and the constant exposure to her poor mental health. Child Protection recently assessed Ms. Shriver as responsible for harm, as she has continued to take [R.P.] to numerous medical professionals and endure unnecessary testing, has shown on numerous occasions to coach [R.P.], especially given his delayed speech, and made ongoing accusations about Mr. Pederson.** Further, Child Protection was concerned about the ongoing reports to Child Protection and the increasing number of interviews of [R.P.] conducted by both Child Protection, SOCIT and other professionals. *See* page 6, **Exhibit D**.
(emphasis added)

51. On July 19, 2022, the relocation trial began, but was abruptly halted after Collette's counsel insisted that Adam undergo a hair follicle drug test.

52. On July 19, 2022, the court reset the trial to begin on October 4, 2022. A copy of the July 19, 2022, judgment is attached hereto as **Exhibit I**.

53. The July 19, 2022, the judgment also ordered Adam to undergo supervised hair follicle testing. *See* page 2, **Exhibit I**.

8

54. The case proceeded to trial on October 4, 2022. Collette asked that she be given leave to relocate to the United States with R.P. Adam asked that R.P. remain in Australia and that his parenting time and decision-making be further expanded.

55. Ultimately a nine-day trial was held in the Federal Court of Australia spanning from October 4, 2022, to November 16, 2022.

56. Both parties were represented by counsel and R.P.'s interests were represented by an independent children's lawyer. Witnesses were called and evidence was produced for the Court.

### *The Court's Judgment*

57. On January 31, 2023, the Family Court entered a 79-page judgment order and pronounced 28 orders. A copy of the judgment is attached hereto as **Exhibit J**.

58. Collette's request to relocate to the United States was <u>denied</u>.

59. Adam and Collette were awarded equal parental responsibility for R.P.

60. Collette's parenting time with R.P. was temporarily suspended so that Adam could catch up on lost time with R.P.

61. Additionally, the judgment ordered that both parties keep the other party informed of their current residential address and contact information.

62. The parties were restrained from relocating the child's residence and Collette was retrained from relocating a distance further than 30 kilometers from Adam's residence.

63. It was ordered that Adam have possession of R.P.'s Australian and U.S. passports.

64. The judgment further stated:

> The mother and father are permitted to take the child out of the Commonwealth of Australia during the long summer school holidays and on not more than one occasion every two years, subject to the following conditions –
>
> (a) unless otherwise agreed in writing between the parties, the travelling parent must notify the other parent in writing and at least six weeks prior to the intended

9

travel, of their intention to travel with the child and remove him from the Commonwealth of Australia;

(b) the travelling parent is not to travel with the child for a period exceeding three weeks and the non-travelling parent have commensurate make-up time in the same and/or immediately next school holiday period or periods;

(c) the travelling parent must provide the other parent with confirmed return airfares for the child and a detailed and final copy of all travel itineraries, such itinerary to include contact details and telephone numbers for all accommodation where the child will be staying and a working mobile telephone number, at least 30 days prior to the intended travel… *See* pages 7-8, **Exhibit J.**

65.  As to the claims of family violence by Collette, the court's judgment on the issue concluded:

Weighing the totality of the mother's evidence about family violence, I take the view that it was imprecise and unsatisfactorily vague, given by a person accustomed to embellishing, and given by a person who was determined to advocate for the cause of family violence… *See* page 24, **Exhibit J**.

66.  In ruling on the issue of relocation, the court explained:

I entertain serious fears that the mother will raise the child in the belief that the mother is a survivor of family violence and that the child is likely to be saturated in the mother's retelling of her perceptions – real or apparent – about family violence. It is also significant, in my view, that one of the mother's stated reasons for seeking relocation was because living in Australia, so she said, was the hardest thing she had ever done. To my mind, that revealed that she was keenest to promote *her* personal happiness ahead of the best interests of *the child*. That showed a particular attitude to her responsibilities of parenthood. *See* page 55, **Exhibit J**.

67.  On February 15, 2023, Adam asked that Collette hand over R.P.'s United States and Australian passports in satisfaction of the Australian Family Court's judgment. Collette refused, falsely claiming that she had lost the passports.

### *Collette's Continued Harassment of Adam*

68.  Despite Collette's efforts to alienate Adam from R.P., Adam and R.P. maintained an extremely close and loving relationship, and both enjoyed their time together.

10

69. However, entry of the Australian court's judgment did not end Collette's campaign against Adam, and in March 2023, Collette made false claims of sexual abuse against Adam and again withheld his parenting time with R.P.

70. The Sexual Offenses and Child Abuse Investigation Team of the Victoria Police ("SOCIT") investigated Collette's claims and determined that there was 'no offense detected' after R.P. admitted that everything he had told investigators was "a lie." A copy of the DFFH's April 26, 2023, report is attached hereto as **Exhibit K**.

71. On April 19, 2023, Collette again made a false report of sexual abuse against Adam after taking R.P. to the children's hospital. A physical examination occurred, no concerns were raised, and there were no physical indications of sexual abuse.

72. The hospital contacted the Victorian Forensic Medical Service and SOCIT, and both confirmed that they would not be investigating the incident. *See* page 2, **Exhibit K.**

73. On April 20, 2023, Collette applied for an Intervention Order with the Melbourne Magistrate's Court, again making false claims of sexual abuse by Adam.

74. On April 21, 2023, Collette did not appear at the parties' changeover location with R.P., although Adam was supposed to exercise parenting time with R.P. and DFFH had informed Collette that she had to attend the scheduled changeover.

75. On April 26, 2023, Adam received a call from DFFH informing him that Collette's support worker had not had contact with her for approximately 24 hours.

76. DFFH engaged the police to conduct a welfare check on Collette, and they discovered that Collette and R.P. were not home, although Collette's dog had been abandoned in the residence. [4]

77. DFFH issued a case report on April 26, 2023, which concluded:

The Department have assessed that [R.P.] is at a likelihood of emotional harm due to Ms. Shriver's continual reporting of sexualised behaviour and sexual abuse experiences. Concerns remain for Ms. Shriver's continual use of systems to report allegations of sexualized behaviour and sexual abuse experiences and that it is having a flow on effect of multiple interviews (and/or examinations) of [R.P.] conducted by both Child Protection, SOCIT, and other professionals. There are concerns that [R.P.] is continually exposed to parental conflict which further impacts his emotional development and individual relationship with both of his parents. Furthermore, the reported sexualised behaviours have not been witnessed by any other third party to evidence their existence and raise concerns for Ms. Shriver's motivation for repeatedly reporting this. *See* page 3, **Exhibit K**.

78. At Adam's request, on April 26, 2023, the Federal Circuit and Family Court of Australia entered an *ex parte* order restraining the parties from removing R.P. from Australia. The order also asked that the Australian Federal Police add R.P.'s name to the Family Law Watchlist. A copy of the Court's April 26, 2023, order is attached hereto as **Exhibit L**.

79. On April 27, 2023, a hearing was held on Collette's application for an Intervention Order. Adam and his family appeared in court, but Collette failed to appear.

80. At the hearing, Ms. Rochelle Byrne from DFFH appeared and advised the court that that it was DFFH's belief that Collette was maliciously abusing the legal system.

81. Collette's application for Intervention Order was 'struck out,' or denied, deemed to be an 'abuse of process' by the presiding Magistrate. A copy of April 27, 2023, certified extract is attached hereto as **Exhibit M**.

---

[4] The City of Port Melbourne eventually rescued the dog and brought her to a local shelter. It was later confirmed that she had been left in Collette's apartment for four days unattended.

*Collette's kidnapping of R.P.*

82. While waiting in court on Collette's application for an Intervention Order, Adam received a call from DFFH advising him that Collette's passport had been used on April 23, 2023, to leave Australia with R.P.

83. A case plan reflecting R.P.'s kidnapping by Collette was created by DFFH on May 18, 2023. A copy of the case plan is attached hereto as **Exhibit N**.

84. Child Protection's case plan, in part, states:

**Protective concerns**

The Department have assessed that [R.P.] is at a likelihood of emotional harm due to Ms. Shriver's continual reporting of sexualised behaviour and sexual abuse experiences that have not been witnessed by any other third party to evidence their existence and raise concerns for Ms. Shriver's motivation for repeatedly reporting this.

Concerns remain for Ms. Shriver's continual use of systems to report allegations of sexualised behaviour and sexual abuse experiences and that this is having a flow on effect of multiple interviews (and/or examinations) of [R.P.] conducted by both Child Protection, SOCIT, and other professionals.

Concerns that [R.P.] is continually exposed to parental conflict which further impacts his emotional development and individual relationship with both of his parents.

Since Child Protection completed their assessment, it has been reported that Ms Shriver and [R.P.] fled from their Melbourne property and have departed the Country and are believed to have flown to America.

85. On May 16, 2023, Adam contacted the Woodstock, Illinois, police department and requested that they conduct a welfare check on R.P.

86. The Woodstock Police confirmed that Collette and R.P. were residing at Collette's mother home at 1312 Oakview Terrace, Woodstock, Illinois.

87. In June 2023, Adam arranged for a 'voluntary return home' letter to be sent to Collette from the United States Central Authority.

13

88. Upon information and belief, Collette never replied to the United States Central Authority's letter.

89. Adam never consented to R.P. moving to the United States.

90. By kidnapping R.P., Collette is in defiance of numerous Australian Court orders. Because Collette's requests to relocate were denied in Australia, she decided to kidnap R.P., depriving him of the familial network and social services he relies on in Australia, and jeopardizing his mental, emotional, and physical health.

91. R.P. was a habitual resident of Australia for his entire life until Collette removed him to the United States, and he had never lived outside Australia.

92. Despite Adam's efforts to contact Collette and her family, Adam has not reached Collette and has had no contact with R.P. since April of 2023.

93. Adam resides in Australia and is able to travel to the United States should he need to appear in court for hearing in this matter.

### IV. WRONGFUL REMOVAL OF CHILD BY RESPONDENT: CLAIM FOR RELIEF UNDER THE HAGUE CONVENTION

94. As set forth above, on or about April 23, 2023, Collette wrongfully removed the Child within the meaning of Article 3 of the Convention.

95. This violated the Australian Court's January 31, 2023, judgment which explicitly stated that R.P. was not to relocate to the United States, and that both parents' permission was required for R.P. to leave Australia.

96. Adam did not acquiesce or consent to the removal of R.P. from Australia to the United States or his living permanently outside of Australia.

97. Collette's removal of R.P. is wrongful within the meaning of Article 3 of the Convention because:

a.   It is in violation of Adam's rights of custody as established by Australian law and the court's January 31, 2023, judgment. Specifically, the parties' custody judgment did not grant Collette the authority to unilaterally remove the minor child to a foreign country; and

b.   The minor child habitually resided in Australia within the meaning of Article 3 of the Convention immediately before his removal by Collette.

98.   Collette has wrongfully removed R.P. to the State of Illinois, County of McHenry.

99.   Upon information and belief, Collette has taken to the child to her mother's home 1312 Oakview Terrace, Woodstock, Illinois 60098.

100.   R.P. is presently five (5) years old. The Hague Convention applies to children under sixteen (16) years of age and thus applies to the minor child.

101.   This Petition is filed less than one (1) year from the time that Collette physically removed the minor child from Australia without the knowledge or consent of Adam.

### V. WRONGFUL RETENTION OF CHILD BY RESPONDENT: CLAIM FOR RELIEF UNDER THE HAGUE CONVENTION

102.   As set forth above, as of September 18, 2023, Collette continues to wrongfully retain the minor child in the State of Illinois, United States, in violation of Article 3.

103.   Adam did not acquiesce or consent to R.P. living permanently outside of Australia.

104.   Collette's retention of the minor child is wrongful within the meaning of Article 3 of the Convention because:

a.   It is in violation of Adam's rights of custody as established by Australian law and the court's January 31, 2023, judgment. Specifically, the parties' custody judgment did not grant Collette the authority to unilaterally retain the minor child in a foreign country; and

b.   The minor child habitually resided in Australia within the meaning of Article 3 of the Convention immediately before his removal and retention by Collette.

105.   Collette is presently wrongfully retaining the minor child in the State of Illinois,

15

County of McHenry, United States.

106. Upon information and belief, Collette is keeping the minor child at 1312 Oakview Terrace, Woodstock, Illinois 60098.

107. The minor child is presently five (5) years old. The Hague Convention applies to children under sixteen (16) years of age and thus applies to the minor child.

108. This Petition is filed less than one (1) year from the time that Collette physically removed the minor child from Australia without the knowledge or consent of Adam.

## VI. PROVISIONAL REMEDIES
### (22 U.S.C. §9004 & HAGUE CONVENTION, ARTICLE 6)

109. Based on the facts and circumstances of the present case, Adam requests that this Court issue an immediate order:

   a. Restraining Collette from removing or concealing the minor child from the jurisdiction of this Court;

      i. This remedy is warranted because Adam is reasonably likely to succeed on the merits of the underlying claim since he is seeking to enforce a valid, duly executed Australian judgment.

      ii. No adequate remedy at law exists because no amount of money could be paid to remedy the loss of Adam's son.

      iii. Adam may suffer irreparable harm if the injunction is denied because Collette has demonstrated an inclination to escape the court's jurisdiction in order to avoid its authority, and if Collette is not restrained from removing or concealing the minor child, she is likely to take him to another state or country to prevent his return to Australia.

   b. Directing Collette or any United States Marshal or other law enforcement officer to bring the minor child before this Court;

      i. This remedy is warranted because Adam is reasonably likely to succeed on the merits of the underlying claim since he is seeking to enforce a valid, duly executed Australian judgment.

      ii. No adequate remedy at law exists because no amount of money could be paid to remedy the loss of Adam's son.

       iii. Adam may suffer irreparable harm if the injunction is denied because if R.P. is not brought before this Court, Collette may attempt to take him outside of this Court's jurisdiction to prevent his return to Australia.

   c. Scheduling an expedited hearing on the merits of this Petition;

       i. This remedy is warranted because Adam is reasonably likely to succeed on the merits of the underlying claim since he is seeking to enforce a valid, duly executed Australian judgment.

       ii. No adequate remedy at law exists because no amount of money could be paid to remedy the loss of Adam's son.

       iii. Adam may suffer irreparable harm if the injunction is denied because Collette has been determined to be a danger to R.P., and every day he remains with Collette in the United States is another day that he is exposed to her instability and recklessness. Further, it is unknown whether R.P. is receiving education and healthcare in the United Stated, which he receives for free in Australia.

   d. Ordering Collette to turn over the minor child's passports to Adam or his United States counsel.

       i. This remedy is warranted because Adam is reasonably likely to succeed on the merits of the underlying claim since he is seeking to enforce a valid, duly executed Australian judgment.

       ii. No adequate remedy at law exists because no amount of money could be paid to remedy the loss of Adam's son.

       iii. Adam may suffer irreparable harm if the injunction is denied because if R.P.'s passports are not handed over, Collette may attempt to take him outside of this Court's jurisdiction to prevent his return to Australia.

### VII. ATTORNEY FEES AND COSTS
### (22 U.S.C. §9007)

110.    Adam has incurred costs as a result of the wrongful retention of the minor child by Collette.

111.    Adam respectfully requests that this Court award him all costs and fees, including transportation costs, incurred as required by 22 U.S.C. § 9007.

## VIII. NOTICE OF HEARING
## (22 U.S.C. §9003(c))

112. Pursuant to 22 U.S.C. § 9003(c), Collette shall be given notice of these proceedings in accordance with the laws governing notice to interstate child custody proceedings. WHEREFORE, Petitioner, ADAM KEITH PEDERSEN, prays for the following relief:

A. An immediate injunctive order prohibiting the removal of the minor child from the jurisdiction of this Court pending a hearing on the merits of this Verified Complaint, and further providing that no person acting in concert or participating with Respondent, COLLETTE RENEE SHRIVER, shall take any action to remove the minor child from the jurisdiction of this Court pending a determination on the merits of the Verified Complaint;

B. An immediate injunctive order directing COLLETTE RENEE SHRIVER or any United States Marshal or other law enforcement officer to bring the minor child before this Court;

C. An immediate injunctive order directing COLLETTE RENEE SHRIVER to turn over the minor child's United States and Australian passports to ADAM KEITH PEDERSEN or his United States counsel;

D. The scheduling of an expedited preliminary injunction hearing on the merits of the Verified Complaint, an order that COLLETTE RENEE SHRIVER show cause at this hearing why the minor child should not be returned to Australia and why such other relief requested in the Verified Complaint should not be granted, and, pursuant to Federal Rule of Civil Procedure 65, an order that the trial of the action on the merits be advanced and consolidated with the hearing on the Verified Complaint;

E. A final judgment in ADAM KEITH PEDERSEN'S favor establishing that the minor child shall be returned to Australia with ADAM KEITH PEDERSEN;

F. An Order requiring COLLETTE RENEE SHRIVER to pay ADAM KEITH

PEDERSEN'S expenses and costs, including transportation costs and ADAM KEITH PEDERSEN'S attorney fees, under 22 U.S.C. § 9007, such expenses and costs to be resolved via post-judgment motion, consistent with the procedure outlined under the local rules of this Court; and

   G. For any such further relief as may be just and appropriate under the circumstances of this case.

                   Respectfully submitted,
                  LAKE TOBACK DiDOMENICO
                   Attorneys for Petitioner

             BY: _____
                 ONE OF PETITIONER'S ATTORNEYS

**LAKE TOBACK DiDOMENICO**      **LAW OFFICE OF TERRY D. SLAW**
Attorneys for Petitioner          Attorney for Petitioner
Sean M. Hamann, Esq.         Terry D. Slaw, Esq.
Attorney ID: 6306095          Attorney ID: 06183906
33 North Dearborn, Suite 1720      Post Office Box 5633
Chicago, Illinois 60602         Buffalo Grove, IL 60089
Telephone No. (312) 726-7111      Telephone No. (847) 845-2042
shamann@laketoback.com        tds_60062@hotmail.com

## VERIFICATION BY CERTIFICATION

Under penalties as provided by law pursuant to Rule 11 of the Federal Rules of Civil Procedure I certify that the statements set forth in this instrument are true and correct except as to matters therein stated to be on information and belief and as to such matters I certify that I verily believe the same to be true.

Dated: September 18, 2023          /s/Adam Pedersen
                                                                   ADAM KEITH PEDERSEN