# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

ADAM KEITH PEDERSEN,

                Petitioner,

       v.

COLLETTE RENEE SHRIVER,

                Respondent.

No. 23-cv-13836

Judge John F. Kness

## MEMORANDUM OPINION AND ORDER

This case concerns a petition seeking the return to Australia of R.P., a minor child and the offspring of Petitioner Adam Keith Pedersen and Respondent Collette Renee Shriver. Respondent removed R.P. to the United States in 2023, and Petitioner seeks an order compelling R.P.'s return to his home country under the Hague Convention on the Civil Aspects of International Child Abduction. To resolve contested matters of fact, this Court held a four-day bench trial beginning on July 22, 2024. This opinion serves as the Court's written ruling following that trial.

Based on the findings of fact and conclusions of law set forth below, the Court grants the Petition. R.P. is ordered to be returned to his home country of Australia forthwith, in a manner best calculated to balance R.P.'s subjective interests against the right of Petitioner to the prompt return of his son.

## I.    PROCEDURAL BACKGROUND

Petitioner filed this petition on September 18, 2023, seeking the return of his minor child, R.P., under the International Child Abduction Remedies Act (ICARA), 22 U.S.C. § 9001 *et seq.* (Dkt. 1.) Respondent answered, asserting the "grave risk" affirmative defense. (Dkt. 14.)   Petitioner moved to strike many of Respondent's statements in her Answer, which led to a delay in the proceedings to permit briefing on the motion and time for the Court to consider how to rule on the motion. (Dkt. 16.) On May 24, 2024, by agreement of the parties and as required by the Convention, the Court set this action for a bench trial and required the parties to commence expedited discovery. (Dkt. 34.) A four-day trial was held from July 22, 2024 to July 25, 2024. (Dkts. 53–56.)

## II.   LEGAL STANDARDS

In an action "tried on the facts without a jury," Rule 52 of the Federal Rules of Civil Procedure requires the court to "find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). The court's task is to "decide whom to believe (and how much to believe) on the basis of the coherence and plausibility of the contestants' testimony, corroboration or contradiction by other witnesses, and other clues to falsity and veracity." *Khan v. Fatima*, 680 F.3d 781, 785 (7th Cir. 2012). The court must " 'explain the grounds' of its decision and otherwise demonstrate a 'reasoned, articulate adjudication.' " *Torres v. Tovar*, No. 22-cv-3806, 2023 WL 5431352, at *1 (N.D. Ill. Aug. 23, 2023) (quoting *Aprin v. United States*, 521 F.3d 769, 776 (7th Cir. 2008)).

In adjudicating Respondent's affirmative defense, the Court has considered the applicable caselaw and the totality of evidence the parties presented at trial. As part of this task, the Court has considered the weight it will accord to the evidence, including each witness's credibility. In assessing witness credibility, the Court observed and considered, among other things, "each witness's demeanor and facial expressions; intelligence; ability and opportunity to see, hear, or know the matters about which the witness testified; memory; potential for bias; and the believability of the witness's testimony considering the other evidence presented." *Torres*, 2023 WL 5431352 at *1; *see also Anderson v. City of Bessemer, N.C.*, 470 U.S. 564 (1985) (trial judge is in the best position to assess witness credibility). This decision on the merits incorporates the Court's findings of fact and conclusions of law as required by Rule 52 of the Federal Rules of Civil Procedure.

With respect to evidentiary matters, the Court, as have other federal courts addressing in the context of the Hague Convention, applied the Federal Rules of Evidence to determine what documents and other evidence were admissible and for what purpose. *See, e.g.*, *Torres*, 2023 WL 5431352, at *2; *Ho v. Ho*, No. 20 C 6681, 2021 WL 2915161, at *2 (N.D. Ill. July 12, 2021); *Schwartz v. Hinnendael*, No. 20-cv-1028, 2020 WL 5531564, at *2 (E.D. Wis. Sept. 15, 2020); *Luedtke v. Luedtke-Thomsen*, No. 12-cv-750, 2012 WL 2562405, at *1 (S.D. Ind. June 29, 2012).

The Federal Rules of Evidence require a party seeking to admit an item of evidence to authenticate that item. Fed. R. Evid. 901. But 22 U.S.C. § 9005 provides that an item of evidence seeking to be admitted in the adjudication of a Hague petition

under ICARA requires "no authentication . . . to be admissible in court." 22 U.S.C. § 9005; *see also Ho*, 2021 WL 2915161, at *2; *Torres*, 2023 WL 5431352, at *2; *Guerrero v. Oliveros*, 119 F. Supp. 3d 894, 907 & n.4 (N.D. Ill. 2015); *In re Interest of Zarate*, No. 96-cv-50394, 1996 WL 734613, at *2 (N.D. Ill. Dec. 23, 1996). Accordingly, the Court did not reject any proffered exhibits on the grounds that they had not been authenticated, nor did any party object to this practice.

## III.    FACTUAL BACKGROUND AND FINDINGS

### A.    Framework of this Section

In setting forth the facts and findings essential to this ruling, some prefatory explanation is necessary. This case came to the United States courts following protracted and detailed custody proceedings in a court of Australia. For the reasons provided in this Court's separate opinion denying Petitioner's earlier motion to strike Respondent's grave risk of harm affirmative defense, those Australian proceedings do not compel, either as a matter of legal preclusion or comity, a particular result in this case. But as the finder of fact here, the Court need not and should not ignore the significant (and factually related) record developed in Australia—particularly when the findings of that tribunal are consistent with this Court's own view of the evidence presented by the parties. Put differently, the Court considers the findings and holdings of the Australian court to be both illuminating and persuasive as to the sole issue to be decided in this case: whether Respondent has met her burden of showing by clear and convincing evidence that R.P. faces a grave risk of harm if he is returned to Australia. As a result, the following recitation explores to a significant degree the

Australian proceedings. The record of that case, as is relevant here, was set forth at the trial in this case by way of exhibits and witness testimony.[1] That evidence is woven into the lengthy factual recitation below.

### B.    Beginning of the Relationship

Petitioner Adam Keith Pedersen is an Australian citizen who is employed as a laborer. (PX25-0011;[2] Dkt. 1 ¶ 1.) Respondent Collette Renee Shriver is a United States citizen from the Chicago, Illinois suburbs who was previously employed as a barber but is currently unemployed, although she at one point (likely falsely) reported employment as a special education teaching assistant. (PX2-0001; PX21-0001; PX25-0011; Dkt. 1 ¶¶ 8, 9.) Respondent traveled to Australia in 2016 on a working visa. (PX2-0001; PX25-0011.)

Petitioner and Respondent met in Australia in May 2017. (PX25-0011; Dkt. 1 ¶ 9.) They married on September 23, 2017 in Australia; around the same time, Respondent discovered that she was pregnant with Petitioner's child. (PX25-0012; Dkt. 1 ¶ 10.) Respondent had a difficult and stressful pregnancy, which she has reported was partially due to Respondent's purported alcohol and drug abuse.[3] (PX3-

---

[1] Neither side called R.P. as a witness nor suggested that the Court interview him. In view of that approach, the Court decided it would be unwise to take that step at its own instance. That said, Petitioner presented at trial a short video taken on the last day Petitioner saw R.P. In that video, which depicted an Easter-themed celebration at Petitioner's home, R.P. appeared happy and relatively well-adjusted. R.P. also exhibited no obvious fear of or aversion to Petitioner.

[2] Throughout this Opinion, Petitioner's exhibits are referred to as "PX____." Respondent's exhibits are referred to as "RX____."

[3] Petitioner testified that he currently drinks alcohol and uses marijuana for medical purposes. He admitted that he has used cocaine, ecstasy, meth, and crystal meth in the past, although he denied using any of these illegal drugs recently.

0001.) Despite these difficulties, Respondent gave birth to a healthy son, R.P., in May 2018. (*Id.*; Dkt. 1 ¶ 10.) R.P. has passed all expected milestones, but several reports state that he struggles with language and speech delays. (PX3-0001–2; PX43-0002; PX46.) R.P. saw a speech therapist in Australia to address these delays. (PX43-0002.) R.P. also saw occupational therapists in Australia and was referred to various psychological services, though Respondent testified that R.P. did not see any therapists, pediatricians, or mental health professionals in Australia. (PX3-0010; PX49-15-0031; RX2050 at 13.)

### C. Dissolution of the Relationship and First Allegations of Abuse

In November 2019, when R.P. was about a year and a half old, Petitioner and Respondent separated after a "violent incident."[4] (PX2-0001; PX3-0002; PX49-15-0019.) Respondent has reported that part of the reason the parties separated was because of Petitioner's continued drug and alcohol use, and that Petitioner would yell at Respondent and R.P. (PX3-0002.)

Around this time, Respondent and R.P. went to Chicago, Illinois for nine weeks over the holiday season. (PX49-15-0014.) They returned to Australia in January 2020 where they lived in a shared house. (*Id.*; PX2-0001.) In June 2020, during the COVID-19 lockdowns, Respondent and R.P. accepted an invitation to live with Petitioner and his mother. (*Id.*) But in October 2020, Respondent and R.P. left, again due to Petitioner's allegedly "abusive nature." (PX3-0002; PX2-0001.) At this time, Respondent obtained a Family Violence Intervention Order (IVO) against Petitioner,

---

[4] The parties agree that a "violent incident" happened, but the details of the incident are disputed. (PX49-15-0014.)

preventing Petitioner from having any contact with R.P. for a limited time. (PX49-15-0014.) Respondent and R.P. lived in various places after that, including a women's domestic violence shelter. (PX3-0002.)

Petitioner did not see R.P. for several weeks after the IVO was entered, but in November 2020 he began to spend weekly visits with R.P. supervised by the Department of Families, Fairness and Housing (DFFH) "due to concerns of risk to [R.P.]." (PX49-15-0015.) This arrangement lasted until February 2021, when DFFH "assessed that there were no protective concerns for R.P. whilst spending time with [Petitioner] and no requirement for ongoing supervision . . . ." (*Id.*)

### D. Custody Proceedings

In October 2020, Petitioner filed an Initiating Application and affidavit in the Federal Circuit Court of Australia, officially initiating a custody case. (PX49-15-0015; Dkt. 1 ¶ 35; Dkt. 1-5.) In March 2021, an interim order relating to the IVO allowed R.P. to split time between Respondent and Petitioner, although Petitioner's parenting time was to be supervised by one of his family members. (PX49-15-0015.) Petitioner sought a final order splitting parental time between the parties, while Respondent sought a final order where she had sole custody of R.P. and would be able to relocate to the United States. (*Id.*) Petitioner's case was transferred to the Federal Circuit and Family Court of Australia (the "Australian Court") and, after numerous delays, culminated in a nine-day trial held in October and November 2022. (PX25-0012.) The purpose of the trial was to determine custody of R.P. and whether Respondent could relocate with R.P. to the United States. (*Id.*)

As the custody dispute proceeded, the Australian Court requested that DFFH prepare a report summarizing its investigation of the parties' relationship with R.P. (PX37.) DFFH issued its report on April 14, 2022, revealing that Respondent had made no fewer than seven calls to Child Protection[5] between September 2020 and April 2022 alleging that Petitioner verbally, physically, and sexually abused R.P. (*Id.*) DFFH reports that it investigated each call and took appropriate action based on the circumstances. (PX37.) For instance, Respondent's first call on September 24, 2020 alleged that Petitioner would sometimes "slap [R.P.] on the hand until welts developed" and had in one instance pushed Respondent against a wall. (PX37-0002.)

After Child Protection interviewed Petitioner, who reported a different story, it initially limited Petitioner's contact time with RP but later removed those limitations because it assessed "no concerns raised about [Petitioner]." (*Id.* at 0003.) But Child Protection did assess R.P. to be "at risk of emotional harm whilst in the care of his parents . . . due to his exposure to the verbal arguments between his parents." (*Id.*) Respondent's next several calls to Child Protection reported additional abuse allegedly perpetrated by Petitioner; these calls were investigated but closed at intake because Child Protection had previously assessed that "there was no significant or imminent risk of harm" to R.P. by Petitioner. (*Id.* at 0005.) Respondent's allegations against Petitioner grew more serious with each report, with most of her

---

[5] Child Protection is a department within DFFH that investigates allegations that a child is at risk of significant harm, refers children to services that can assist in the safety of children, and works with the Children's Court to ensure the child's safety if needed. *Families and Children: Child Protection*, DEP'T OF FAMILIES, FAIRNESS & HOUSING STATE GOV'T OF VICTORIA (Dec. 19, 2022), https://services.dffh.vic.gov.au/child-protection. For purposes of this Opinion, Child Protection and DFFH are used interchangeably.

later reports stating that R.P. exhibited overly sexualized behavior, which she attributed to Petitioner's alleged abuse. (*Id.* at 0005–6.) One of Child Protection's last investigations resulting from one of Respondent's calls assessed Respondent, not Petitioner, as responsible for emotional harm to R.P., as she had "continued to take R.P. to numerous medical professionals and endure unnecessary testing." (*Id.* at 0005.) Child Protection additionally found that Respondent "has shown on numerous occasions to coach R.P. especially given his delayed speech" and was responsible for "inflicting ongoing emotional distress and harm" to R.P. by continuously exposing him to Respondent's "poor mental health." (*Id.*) When Respondent was asked about this DFFH report at the trial, she testified that DFFH was biased against her in this report and did not properly investigate all of her accusations (specifically, they allegedly ignored R.P.'s medical records) before coming to their conclusions.

The Australian Court considered DFFH's report (PX37), an additional family report (PX49-15), and R.P.'s best interests before reaching a judgment in the custody and relocation trial on January 31, 2023. (PX25.) Both parties were represented by attorneys at that trial, and R.P. was also represented by an Independent Children's Attorney. (*See id.*) In its decision, the Australian Court denied Respondent's relocation request and awarded Respondent and Petitioner with "equal shared parental responsibility for [R.P.]," providing a detailed explanation of how parental time should be split between the parties. (*Id.*) Both parties were instructed to keep one another informed of their current residential address and were prohibited from relocating R.P without agreement or court order. (*Id.* at 0006.)

The Australian Court also found Respondent to be "obsessively behaved towards [R.P.]" and keen to "promote her personal happiness ahead of the best interests of the child." (*Id.* at 0065.) Presiding Judge Wilson noticed Respondent seemed "willing to accept seemingly anything [R.P.] said about [Petitioner] especially when unfavourable, without first testing the likelihood of [R.P.'s] statement having any foundation in fact." (*Id.* at 0058.) Judge Wilson viewed Respondent's evidence at trial to be "imprecise and unsatisfactorily vague, given by a person accustomed to embellishing, and . . . determined to advocate for the cause of family violence." (*Id.* at 0034.)

In her testimony before this Court, Respondent addressed the Australian Court trial. Respondent became defensive, stating multiple times that the trial was unfair and that Judge Wilson was biased against her. With a raised voice, Respondent testified that some of the evidence at that trial was fabricated with an intent to make her look crazy. When pressed on cross examination about what exactly was unfair about the trial, Respondent was unable to provide specifics, although she eventually stated that Judge Wilson did not consider Petitioner's alleged drug use. Respondent testified that she was unable to remember certain details of the trial because it happened years ago, but she generally recalled that the entire proceeding was biased against her and that Judge Wilson was wrong in his decision.

### E.    Allegations of Abuse Continue

After the Australian Court issued its January 2023 judgment, Respondent continued to allege that Petitioner was sexually abusing R.P. Respondent reported

that R.P. had become increasingly aggressive and displayed sexually inappropriate behaviors at home and at daycare. (PX40-0001.) Respondent is of the opinion that R.P.'s behaviors have become more aggressive and sexual because Petitioner sexually abused R.P. when R.P. was in Petitioner's custody. (*Id.*)

Respondent reported that R.P. made several sexually explicit "disclosures" to her (*id.*), which Respondent testified about as well. For instance, Respondent testified that R.P. would pretend his penis was a lollipop, or would act out sexual scenarios in the bath, or stick his finger in his anus. (*Id.*) Respondent testified that she noticed that the "disclosures" R.P. made to her would often happen after R.P. came from Petitioner's parenting time. Respondent testified that she observed R.P. speaking less and staring off into space, sometimes speaking in baby talk, afraid of the dark and the bathroom, and scared that someone would come kill him and Respondent—all of which she believed to be concerning and a result of serious abuse.

Respondent reported these allegations via several visits to police stations and by contacting DFFH. (*Id.*) DFFH began another investigation, this time deciding to involve R.P.'s childcare facility and SOCIT[6]. (*Id.*) R.P.'s childcare facility responded that they had not observed any sexual behaviors or sexual noises from R.P., and SOCIT concluded that no further action was necessary as there was "no offen[s]e detected." (*Id.*)

---

[6] SOCIT is an acronym for Sexual Offenses and Child Abuse Investigation Team, a specialized unit of Australian law enforcement made up of specialists who are specially trained to respond to and investigate child sex crimes and assist victims. *Sexual Offences and Child Abuse Supports Teams and Centres*, VICTORIA POLICE (June 21, 2024), https://www.police.vic.gov.au/sexual-offence-child-abuse-teams-centres.

Respondent reportedly tried to get R.P. to see a psychologist to address these issues, but Petitioner refused to consent, as he denies that R.P. has displayed "sexuali[z]ed behaviors" or that "anything untoward has occurred." (*Id.* at 0002.) Indeed, Petitioner testified before this Court that R.P. never made any such disclosures to him, so Petitioner saw no reason for R.P. to get any psychological help. Petitioner added that he believed Respondent had taken R.P. to enough doctors and specialists, and didn't think R.P. needed to see anyone else, especially since Petitioner did not observe anything concerning from R.P.

Child Protection was contacted again on April 19, 2023, when Respondent took R.P. to the hospital after she found "white sticky stuff in [R.P.'s] underwear" the previous day. (*Id.*) Respondent testified that R.P. had appeared frightened and would not talk to her that day, and that she became especially concerned when she later observed a white substance secreting from R.P.'s bottom when he was using the bathroom. After a physical examination the next day, the hospital saw no "physical indicators of sexual abuse" but raised concerns that Respondent didn't admit R.P. until the day after the abuse allegedly occurred. (*Id.*) Neither DFFH nor SOCIT conducted any further investigation of this incident. (*Id.*)

### F. Second IVO

One day later, on April 20, 2023, Respondent went to the Melbourne Magistrate's Court and applied for an Intervention Order against Petitioner related to her concerns about R.P.'s alleged abuse. (*Id.* at 0003; RX2050.) Respondent testified that she was motivated to file this application because she was concerned

about the underwear incident. In her application, Respondent recalled various instances since early 2020 where Petitioner allegedly abused her and R.P., why she felt she had to leave Australia, numerous sexual statements R.P. had allegedly made to her, and R.P.'s various physical ailments (such as bruises and rashes) that she attributed to Petitioner's abuse. (RX2050 at 5–17.) But when asked about this application at trial, Respondent had a very difficult time remembering the things R.P. allegedly stated to her in early 2023 and that she listed in the application, testifying that there were too many disclosures to remember.

A social worker named Na-Rae, who had also allegedly observed the white substance in R.P.'s underwear, assisted Respondent in filling out her application for an Intervention Order. (RX2050.) But Na-Rae did not include the underwear incident in Respondent's application for an Intervention Order, even though it had allegedly happened the day before and was witnessed by Na-Rae. Respondent testified that this incident was likely not included because it had just happened and she didn't have time to include it. Na-Rae also filled out a Multi-Agency Risk Assessment and Management Framework (MARAM) report for R.P. based on Respondent's allegations, assessing R.P. to be at "serious risk" of harm. (RX2046.)

Around this same time, another interim IVO was granted, restricting Petitioner's contact with R.P. for one week. (*Id.* at 9.) Respondent testified that she had wanted this interim IVO to have a term of three months, rather than just one week. Respondent testified that she believed it was shortened to one week because Ms. Rochelle Byrne, the DFFH social worker assigned to R.P.'s case, had colluded

with the judge who granted the IVO to shorten the term to only one week. Ms. Byrne later denied this when she testified. A hearing on Respondent's Intervention Order application was set for April 27, 2023. (PX41.)

On April 21, 2023, Respondent failed to appear at a scheduled changeover to deliver R.P. to Petitioner for his parenting time. (Dkt. 1 ¶ 74.) With the assistance of Australian and United States law enforcement, Petitioner discovered that Respondent and R.P. had fled Australia and relocated at Respondent's mother's home in Woodstock, Illinois. But the April 27 hearing on the Intervention Order proceeded in Respondent's absence. (PX41.) Petitioner attended, as did Ms. Byrne (via video).

At the April 27 hearing, Ms. Byrne presented the Magistrate Judge with a letter summarizing Respondent's allegations, including the April 19 hospital visit and her investigation. Ms. Byrne testified that this letter was informed by her review of R.P.'s Child Protection file, which included R.P.'s MARAM risk assessment (which had assessed R.P. as being at "serious risk" of harm) and other various sources. When asked at this trial about the MARAM risk assessment and why it was not mentioned in her letter, Ms. Byrne testified that she reviewed it but did not include it in her letter because it was based on Respondent's assessment of R.P., not a medical professional's assessment. Ms. Byrne reiterated that her letter was based on her investigation and professional opinion of R.P.'s family situation and potential risk of harm—not on the allegations, accusations, or any other statements that either party made.

14

Ms. Byrne's letter ultimately concluded that "there has been insufficient evidence to substantiate that sexual harm has occurred" to R.P. (PX40-0003.) Ms. Byrne's letter stated (and she confirmed in her testimony) that there were inconsistencies in disclosures made by R.P. and Respondent, which raised uncertainties "relating to whether there has been external influences or potential coaching." (*Id.*) Ms. Byrne's letter expressed concern for Respondent's regular use of the legal system to report allegations of abuse, and concern for the fact that R.P.'s alleged sexual behaviors were never witnessed by anyone other than Respondent, which raised questions about Respondent's motivation for reporting. (*Id.*) Ms. Byrne's letter assessed R.P. to be at a "likelihood of emotional harm due to [Respondent's] continual reporting of sexuali[z]ed behavior and sexual abuse experiences" and held no concerns for R.P.'s contact with Petitioner.[7] (*Id.*) After considering Ms. Byrne's letter, the Magistrate Judge "struck out" Respondent's application for an Intervention Order. (PX41-0001.)

Ms. Byrne, according to Petitioner, had been very involved in R.P.'s case since Respondent made her new allegations to Australian authorities in 2023. Ms. Byrne attended changeovers of custody, interviewed all involved parties, and investigated

---

[7] Ms. Byrne also completed a "case plan," which is a document Child Protection regularly produces after a determination has been made about substantiation of abuse allegations. The case plan addresses any concerns and makes recommendations moving forward. R.P.'s "case plan" was finalized after Respondent removed R.P. from Australia, and it contains substantially the same information and recommendations that Ms. Byrne put forth in her letter to the Magistrate Judge. (PX43.) Ms. Byrne noted in the case plan that she had encouraged Petitioner to seek legal advice regarding next steps and that she was not able to obtain Respondent's views on the case plan due to no contact with Respondent since April 20, 2023. (*Id.* at -0002.)

all allegations. (*See* PX90.) Ms. Byrne herself testified about her investigations in R.P.'s case,[8] explaining how she was named as the DFFH case worker in 2023. She described Child Protection's usual protocol when they receive allegations like the ones they received from Respondent. For R.P.'s case, Ms. Byrne testified that Child Protection decided to investigate the allegations against Respondent. She described the steps she took in her investigation, which eventually resulted in substantiated findings that R.P. was at a likelihood of emotional harm due to Respondent's—not Petitioner's—actions.

## G. Respondent Removes R.P. to America

Respondent arrived in the United States with R.P. on April 23, 2023. (PX2-0002; PX66-0003.) On April 27, 2023—the same day Respondent was required to appear in the Melbourne Magistrate Court for a hearing on her application for an Intervention Order—Respondent filed a petition for order of protection against Petitioner in the Circuit Court of McHenry County, Illinois. (PX66.) During the trial, Respondent first testified that, unlike the application for Intervention Order in Australia, she filled out this petition herself and did so quickly. But a few minutes later, when asked about the contents of a particular paragraph in the petition,

---

[8] Respondent moved to bar Ms. Byrne's testimony because, due to Ms. Byrne's lack of response to Respondent's subpoena request, Respondent was unable to depose her. (Dkt. 44.) The Court denied this motion in limine because it has no subpoena authority over foreign individuals. In any event, Respondent was not prejudiced by the lack of opportunity to depose Ms. Byrne. She has been involved in R.P.'s case for some time, and Respondent was thus familiar with her investigation and her likely testimony. *See David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003); *Bronk v. Ineichen*, 54 F.3d 425, 428 (7th Cir. 1995).

Respondent testified that she could not remember who wrote that paragraph, implying that someone may have assisted her in filling out the petition.

In the McHenry County petition, Respondent re-alleged that Petitioner had been abusing R.P., detailing, among others, the dirty underwear incident. (*Id.* at 0003–4.) Respondent also reported that R.P. had been having nightmares, was wetting the bed, was afraid that someone would hurt him, and was scared of noise or sudden movements. (*Id.* at 0003.) Respondent restated the sexualized statements that R.P. had made to her and reported that R.P. had complained that his private parts were itchy. (*Id.*) Respondent stated that R.P. was suffering physical abuse, sexual abuse, and "extreme control" at the hands of Petitioner, and that R.P.'s ongoing speech delay was "because of the violence portrayed by [Petitioner]." (*Id.*) Respondent concluded that R.P. would be at "grave risk" if he had any contact "whatsoever" with Petitioner and argued that her petition should be granted to "protect my son from his father and give him the care he desperately needs." (*Id.*) Respondent's petition was granted, and a protective order was entered restricting Petitioner's contact with R.P. from April 27, 2023 through May 18, 2023. (RX2053 at 1.)

Respondent began taking R.P. to medical professionals almost immediately after arriving in the United States. One professional was clinical social worker Faith Ann Rys, who testified that she is a licensed clinical social worker who focuses on child abuse victims. (Dkt. 41 at 3.) Ms. Rys began seeing Respondent and R.P. in June 2023. (PX3-001.) Before Ms. Rys met with R.P., she gathered information about R.P.'s

purported abuse from Respondent and why Respondent believed R.P. needed therapy. (*Id.* at 0001–2, 0004–5,0010–12.) Ms. Rys had sessions with R.P. multiple times a week from June 2023 through August 2023, and less frequent sessions between September and December 2023. (PX3.) She also had several sessions with R.P. between January and May 2024. (RX2095.) Respondent testified that she would sometimes sit in on these therapy sessions, but often would not observe the sessions because she found what R.P. was saying to be too hard for her to hear.

Ms. Rys testified at the trial as a treating clinician, not as an expert witness.[9] She testified as to her observations of R.P. during their therapy sessions, noting primarily that he would often rock back and forth and sometimes appeared angry. She also testified about several disclosures R.P. made to her during some of their sessions. In the first session, when asked why he was scared, R.P. described Petitioner as the source of his fear. (PX3-0003.) He made statements about God and fighting devils in the next session. (*Id.* at 0004.) In an early July session, R.P. disclosed to Ms. Rys that Petitioner had hurt his penis by "tapp[ing]" on it. (*Id.* at 0006.) Over the next several sessions, R.P. made additional disclosures to Ms. Rys about abusive things Petitioner had allegedly done to him: Petitioner "put his finger in my butt" (*Id.*), "peed in my mouth" (*Id.* at 0006), "used arms to hurt me and fists"

---

[9] Petitioner sought to exclude Ms. Rys's testimony in its entirety, arguing that Respondent improperly disclosed Ms. Rys as a fact witness when she would in fact be testifying to her evaluations and clinical treatment of R.P.—all within the purview of an expert witness. (Dkt. 45 ¶¶ 19–34.) The Court permitted Ms. Rys to testify as a fact witness, but limited her testimony to non-specialized knowledge. Ms. Rys was also prohibited from testifying about her final report and documents that she referenced in the final report that were destroyed or otherwise not produced to Petitioner. Ms. Rys's testimony was instead limited to her treatment notes and impressions of R.P.

(*Id.* at 0007), "put crayons in my butt" (*Id.*), "put spiders in my butt" (*Id.* at 0008), and sprayed "green bug spray . . . on my bum" (*Id.* at 0010). In one session, R.P. told Ms. Rys about an incident where he was asked to suck the nipples of Petitioner's fiancé. (*Id.* at 0009.) In the next session, Mr. Rys reported that R.P. had asked to see her nipples. (*Id.*) R.P. made similar disclosures during many of the remaining sessions, although in his later sessions he focused primarily on how he was afraid of Petitioner and that Petitioner had hurt his butt. (PX3; RX2095.) Throughout these sessions, whenever R.P. referred to Petitioner, he would use Petitioner's first name "Adam" instead of referring to Petitioner as his father. (*Id.*)

On cross-examination, Ms. Rys testified that she did not perform a truth-lie test on R.P. until February 2024, almost a year into their relationship. R.P. failed that test, but he passed the truth-lie test in June 2024. She conceded that although she believed that some of R.P.'s disclosures truly happened to him, the more fantastical disclosures were likely not true (such as R.P.'s disclosure that Petitioner put spiders in his butt, peed in his mouth 100 times while R.P. was wearing a Sponge Bob shirt, and that R.P. drew Petitioner's face on the toilet). Ms. Rys also testified that she never received documents about any legal proceedings that had happened in Australia, nor was she aware of any prior proceedings related to R.P.'s custody. Nor did she view any medical records or physical evidence that R.P. had been abused. And Ms. Rys did not have an opportunity to speak with any of R.P.'s previous clinicians and treaters from Australia. She testified that she sent Petitioner a letter asking him for information when she began seeing R.P. but didn't receive a response from him,

19

so all of her observations and statements in her treatment notes about Petitioner and R.P.'s situation were based entirely on information provided verbally by either Respondent or R.P.

In January 2024, Ms. Rys referred R.P. to Neil Hemmer, a social worker employed at Zacharias Sexual Abuse Center (the "Center"), who focuses on child sexual abuse victims.[10] (Dkt. 41 at 3.) R.P. has attended weekly therapy sessions with Mr. Hemmer since January 2024. (RX2015 at 1; RX2091.) Mr. Hemmer obtained information about R.P.'s history of alleged abuse and behavioral issues from Respondent. (RX2091 at 7.) Mr. Hemmer took brief progress notes on his sessions with R.P., which he testified were records that the Center kept virtually in an online charting system. (RX2091.) Mr. Hemmer testified that over the course of his roughly twenty-five therapy sessions with R.P., he was able to observe R.P.'s affect. He described R.P. as sometimes scared, sweating, and trembling, with diverted eyes. Mr. Hemmer also testified that R.P. made a handful of disclosures to him during various sessions. These disclosures were later recorded in a letter that Mr. Hemmer wrote on June 6, 2024. (RX2015.) Mr. Hemmer testified that he prepared this letter at Respondent's request after they exchanged emails and met to discuss the details of this litigation. He added that he wrote this letter based off his memory of R.P.'s

---

[10] Like Ms. Rys, Mr. Hemmer testified as a lay witness, not an expert. As such, Petitioner sought to limit Mr. Hemmer's testimony to prevent him from testifying about any opinions beyond his treatment about R.P. that would require specialized knowledge. (Dkt. 45 ¶¶ 63–70.) The Court took this motion under consideration and ruled on objections to Mr. Hemmer's testimony as they were made during trial.

disclosures, which R.P. made about two or three months before Mr. Hemmer wrote the letter.

In this letter, Mr. Hemmer stated that R.P. had made a handful of "spontaneous" and "brief[]" statements to him during some of their therapy sessions. (RX2015 at 1.) Mr. Hemmer recalled that R.P. stated, without elaborating, that he hoped Petitioner "burns in hell for all eternity for the stuff he did to me," and that Petitioner and "his friends hurt my penis, the friends who wear the masks." (*Id.*) During cross-examination, Mr. Hemmer testified that R.P. never disclosed to him some of the things that R.P. did disclose to Ms. Rys. For instance, R.P. never told Mr. Hemmer that Petitioner put fingers or crayons in his anus, or sprayed bug spray on R.P., or that he was asked to perform a sexual act on Petitioner's fiancé.

Mr. Hemmer testified that all reporting of R.P.'s alleged abuse came from his conversations with Respondent, and that he did not look into the validity of what she reported, nor did he look into the validity of R.P.'s statements. He also testified that in his first session with R.P. and Respondent, Respondent provided him with a brief background of the facts that led to R.P.'s need for therapy. But on cross-examination, Mr. Hemmer revealed that he was not aware of nor did he review any prior legal proceedings or court orders related to R.P.'s custody that had occurred in Australia. He did not even know that R.P. was born in Australia. Mr. Hemmer had stated in his deposition that seeing those documents would have affected how he treated R.P. Mr. Hemmer also testified that he did not perform a truth-lie test on R.P. at any point during their therapy sessions. And like R.P.'s sessions with Ms. Rys, Mr. Hemmer

testified that R.P. consistently referred to Petitioner (his father) by first name, which Mr. Hemmer did not find noteworthy.

Since April 2023, while Respondent and R.P. have been in Illinois, Petitioner has remained in Australia. He testified that he has not seen R.P. in sixteen months, and the last time he saw R.P. was Easter 2023. (*See* PX91.) Throughout his testimony, Petitioner denied that he, his friends, or his fiancé have ever sexually or physically abused R.P. He recalled when the abuse allegations began in Australia, stating that he received numerous calls from DFFH, the Australian police, and R.P.'s doctors regarding the allegations. Petitioner testified that he was only aware of the general disclosures that R.P. had made, and his understanding was that R.P. had only made these types of disclosures to Respondent. Petitioner testified that he attempted to attend R.P.'s doctors' appointments in Australia, but he was unable to be present at any of them because Respondent would not notify him about when they were. After hearing the testimony of Ms. Rys and Mr. Hemmer, Petitioner stated that he had no reason to believe that they were not telling the truth, but he strongly believed that Respondent had coached R.P. into making those disclosures to Ms. Rys and Mr. Hemmer. Petitioner expressed incredulity that R.P.'s disclosures to therapists were somehow becoming more serious after he was removed to the United States, even though R.P. had not seen Petitioner for over a year. Petitioner denied ever contacting law enforcement in relation to R.P.'s disclosures because R.P. had never made any disclosures to him. But Petitioner testified that he did contact Australian police once, when Respondent failed to appear at a changeover with R.P. in April 2023.

### H.    Hague Convention Petition and Trial

On September 18, 2023, Petitioner filed this petition under the Hague Convention seeking to return R.P. to Australia. (Dkt. 1.) A four-day trial was held from July 22, 2024 to July 25, 2024. (Dkts. 53–56.) In preparation for that trial, both parties retained expert witnesses. Petitioner retained Dr. Robert Ortega, and Respondent retained Dr. Sharon Johnson. Both experts met with R.P., prepared reports, and testified about their opinions.

Respondent's expert witness, Dr. Ortega, is a licensed social work practitioner with a doctoral degree in social work and psychology. (PX7-0006, 0040.) Currently, Dr. Ortega's primary full-time occupation is as Associate Dean of the University of Michigan, where he teaches courses on child welfare and general clinical practice. (*Id.*; PX10-0001.) He also volunteers his services as co-director of the Family Assessment Clinic (FAC) in Ann Arbor, Michigan. (PX7-0040; PX10-0001.) Dr. Ortega testified that he does not work at the FAC often and has only seen about five children as patients in the past five years. He has written extensively on social work, including a chapter in a book called *The School Services Sourcebook: A Guide for School-Based Professionals*,[11] in which he discussed signs and symptoms of sexually abused children. (PX7-0007–34; RX2026 at 4.)

Dr. Ortega was first referred to R.P. in October 2023 by Ms. Rys, who was previously an intern for the FAC. (PX15-0001.) Ms. Rys contacted Dr. Ortega again

---

[11] Robert M. Ortega, *Students Who Have Experienced Physical or Sexual Abuse*, *in* THE SCHOOL SERVICES SOURCEBOOK: A GUIDE FOR SCHOOL-BASED PROFESSIONALS 136 (Cynthia Franklin, Mary Beth Harris & Paula Allen-Meares eds., 2024).

in June 2024, asking for him to evaluate R.P. before the start of the trial. (PX13.) Dr. Ortega agreed to evaluate R.P. on an expedited basis, and met with R.P. twice in June 2024. (PX7-0043.) He prepared a preliminary report but was unable to complete a final assessment before his testimony at the trial. Accordingly, his expert testimony was limited to the opinions and findings stated in his preliminary report.[12]

Respondent traveled to Ann Arbor, Michigan, with R.P. to meet with Dr. Ortega. (*See* Dkt. 7 at 1–2.) Dr. Ortega testified that, although he ordinarily prefers to have received information about a case before he meets with a patient, he did not have any background information about R.P. before their sessions began.

Dr. Ortega's first session with R.P. was on June 26, 2024. (PX7-0043.) Dr. Ortega wrote that R.P. "appeared animated" and played with the toys provided in the room. (*Id.*) R.P. introduced himself as "[R.P.] Shriver," even though his legal surname is the same as Petitioner's. (*Id.*) Dr. Ortega began by asking R.P. if he understood what the sessions were about, to which R.P. replied that he understood that Dr. Ortega's job was to "keep him safe from his dad." (*Id.* at 0044.) Dr. Ortega testified that R.P. answered this question thoughtfully, as if he had been prepared to answer a question like that and as if he had said it before. When Dr. Ortega asked R.P. to explain what he meant by this answer, R.P. stated that it was because Petitioner was a "bad dad" who had "swapped his butt." (*Id.* at 0045.)[13] Dr. Ortega tried to press R.P.

---

[12] This issue was the subject of a motion in limine by Petitioner. (Dkt. 45 ¶¶ 52–62.) The Court granted Petitioner's motion and barred Dr. Ortega from testifying beyond what was contained in his preliminary report.

[13] Dr. Ortega emphasized that R.P. used the word "swapped" (pronounced as to rhyme with "popped"), although the meaning of that word was not made clear at trial. It may be

about what he meant that Petitioner had "swapped his butt," but R.P. was more preoccupied with various toys. (*Id.*) Dr. Ortega testified that R.P. exhibited some signs of trauma during this session. For instance, Dr. Ortega found it notable that R.P. was adamant about drawing a picture with a lead pencil, rather than a colored pencil, and that R.P. played with a particular lava toy a lot, which showed signs that R.P. was dissociating from Dr. Ortega. R.P. also once stated "I know what you're talking about . . . ask your other questions," which Dr. Ortega testified he understood to mean that R.P. was anticipating certain questions. (*Id.* at 0044.)

Dr. Ortega met with R.P. again on June 28, 2024. (*Id.* at 0046.) In this session, R.P. again stated that Petitioner had once "swapped his bottom." (*Id.* at 0047.) Dr. Ortega also asked R.P. to draw a photo of his family in this session, which R.P. did but notably excluded Petitioner. (*Id.* at 0046.) When Dr. Ortega asked R.P. if he had any memories of Petitioner or remembered what Petitioner looked like, R.P. said he "had no memories" and "didn't remember" what Petitioner looked like. (*Id.*)

Between these visits, Dr. Ortega asked Respondent to fill out two assessment checklists that would allow him to assess whether R.P. experienced any trauma. Respondent filled out both documents: the Trauma Symptom Checklist (TSCYC) (PX18), and the Child Behavior Checklist (CBCL) (PX21). The TSCYC consists of ninety items assessing the behaviors, experiences and feelings of a child who was potentially exposed to trauma. (PX18.) Dr. Ortega testified that the TSCYC can detect whether the individual filling out the form is exaggerating some of the answers, and

---

that R.P. was trying to say "slapped" while burdened by youthful and immature speech development.

that he did not see any indications that Respondent was exaggerating. Respondent filled out the form by circling numbers corresponding to levels of frequency that R.P. was experiencing a particular thing (for instance, 1 = "not at all" and 4 = "very often"). (*Id.* at 0002–6.) Respondent also added commentary on several of these items, and most of the commentary revolved around R.P. allegedly experiencing heightened stress after his interview with "Adam's psych," which the Court understands to mean R.P.'s meeting with Petitioner's expert witness Dr. Johnson. (*See id.*) Dr. Ortega testified that the results of the TSCYC showed that R.P. was experiencing anxiety, depression, thought intrusion, and overall post-trauma stress, all of which suggested that R.P. had experienced trauma and used various strategies to avoid talking about anything that would raise his anxiety level.

Respondent also filled out the CBCL, which identifies ways in which a child between the ages of six to eighteen internalizes versus external things and attempts to capture problematic areas in the child's social behaviors. (PX21.) In the CBCL, Respondent listed R.P.'s social activities, which included various sports, hobbies, and a "more active" participation in Sunday School and Vacation Bible School. (PX21-0001.) Dr. Ortega testified that the CBCL revealed that R.P. was very engaged in social activities and exhibited a high level of social competence, but there were concerns with R.P.'s internalization, pointing to signs that R.P. was anxious, depressed, and withdrawn. Dr. Ortega concluded his preliminary report by stating that R.P. "presents with significant clinical concerns . . . suggesting [that] treatment is recommended." (PX7-0050.) He added that R.P. "should not leave the United

States" and "under no circumstance . . . be unsupervised when in the presence of his father." (*Id.*)

Dr. Ortega testified that the conclusions he stated in the preliminary report were based on the assessments filled out by Respondent and his two sessions with R.P. Dr. Ortega testified that he did not review any legal documents, medical records, or Australian orders until July 3: the same day he wrote his preliminary report. (*See* PX7-0040.) He testified that all factual information about R.P.'s background came from his discussions with Respondent and the assessments she filled out, which he did not verify because it is not protocol to do so. He also testified that he did not observe R.P. exhibit any sexual behaviors, nor did R.P. make any disclosures to him about sexually abusive things that had happened to him in the past. Dr. Ortega testified that he did not observe any behaviors that were consistent with the behaviors and problems Respondent reported in the TSCYC and CBCL.

Petitioner's retained expert witness, Dr. Sharon Johnson, is a licensed clinical psychologist with a Ph.D. in clinical psychology. (PX1-0001.) She testified that she has treated between four hundred and five hundred children under the age of seven in the past five years. She testified that her work is highly structured and standardized, and based on science and objective data.

Dr. Johnson testified that before she met with R.P., she had the opportunity to review documents related to R.P.'s background. She reviewed several Australian legal documents and the letters from DFFH. She also reviewed R.P.'s medical records, which she testified was important because R.P.'s medical records informed her of

27

what she needed to prepare for and be aware of. She added that his medical records revealed that R.P. had a language delay, which caused her to change her approach to ensure that she could communicate effectively with R.P. Dr. Johnson also testified that she knew R.P. had been separated from his father (Petitioner), which she testified was noteworthy because the symptoms of a child who was removed from a parent can look identical to the symptoms of a child who has been abused. She added that the stacking of significant life events can be very hard on a child—such as, in R.P.'s case, five residential moves in a short time span, separation from Petitioner, multiple daycare settings, and conflict between his parents.

Dr. Johnson evaluated R.P. over two sessions that each lasted approximately two hours. (PX2-0002.) The purpose of her evaluation was to determine whether R.P.'s memories of abuse are valid, and whether it is reasonable to conclude that the allegations of child abuse are valid. (*Id.*) She framed her evaluation to "align with [R.P.'s] developmental capabilities" and administered "several standardized neuropsychological measures" to determine his cognitive, communicative, and expressive language abilities. (*Id.*) Dr Johnson's conclusions were stated in a final report completed on July 3, 2024. (PX2.)

Dr. Johnson testified to her conclusions and observations of R.P. She explained that she performed several standardized language, memory, and intellectual functioning tests on R.P. (*Id.* at 0002–3.) Dr. Johnson testified that R.P. had average intelligence, and that his language delays were significant. After conducting some language tests, Dr. Johnson stated that his vocabulary and language patterns were

as expected for a child with a language delay. She testified that R.P. would often confabulate, which she explained was when a child used a similar-sounding word when he or she could not think of the right word. She added that because of R.P.'s age and speech delay, he had a limited vernacular. He did not know several basic words, and several words that R.P. had used when making disclosures of sexual abuse would not be within his vernacular. Dr. Johnson used the word "eternity" as an example (a word R.P. had used in a session with Mr. Hemmer), testifying that a child with R.P.'s age, intelligence, and language delays would be more likely to lean towards more tangible concepts, and would not be able to comprehend spiritual things like "eternity." She testified that statements by a child using words outside his vernacular, such as R.P. did, are rendered invalid because they are not within his developmental capabilities.

Dr. Johnson also tested R.P.'s memory. She stated she ordinarily observes that, when a child discusses what he or she wants to say, the child speaks freely and with no delay. Dr. Johnson testified that this meant that when she conducted a memory test, she was looking at whether R.P. was speaking freely when not self-directed. After performing two memory tests, Dr. Johnson found that R.P. was unable to remember details from two stories she had told him, but was able to remember far more when Dr. Johnson asked him questions about the two stories. (PX2-0005.) She concluded that R.P.'s results "were not unexpected" given his language delay, but this raised concerns "regarding [R.P.'s] ability to accurately and completely recall memories. (*Id.*) She testified that in the context of this case, her findings mean that

29

R.P. would be able to remember things that happened several years ago (such as sexual abuse from Petitioner) only if coached or reminded.

Dr. Johnson also performed a truth-lie test on R.P., which he passed. (*Id.* at 0008.) But she added that just because a child understands the difference between a truth and a lie does not predict whether the child will tell the truth during questioning. (*Id.*) Dr. Johnson testified that failing a truth-lie test would put into question the child's ability to recall an even that actually occurred versus something hypothetical or fantastical. In R.P.'s case, Dr. Johnson testified that R.P. did make several fantastical statements during their sessions. For example, R.P. stated that his grandmother "drank alcohol . . . [and] got soggy black teeth and got fat," a statement that Dr. Johnson considered fantastical and extraordinary, especially since R.P. likely does not understand what alcohol is. (*Id.* at 0012.) Dr. Johnson testified that if a child's statements became more fantastical over time, the statements would become less believable and are rendered invalid. For example, Dr. Johnson agreed that the allegations against Petitioner had become more fantastical over time (starting with slapping R.P. on the hand and escalating into putting spiders or crayons in R.P.'s anus), which she testified made R.P.'s disclosures about those events fantastical and less believable.

Dr. Johnson testified about R.P.'s affect during their sessions. She stated that a child's affect often matches the subject matter when they are speaking. But it does not always guarantee reliability, as children can be very good actors, especially when they know that a reward is available. For example, on cross-examination, when asked

about R.P.'s affect of clenched fists and teared-up eyes when talking about a time when Petitioner allegedly swapped his butt, Dr. Johnson reiterated that this affect did not necessarily make R.P.'s statement more reliable, because the source of R.P.'s emotion remains unclear.

Dr. Johnson also testified that children often remember things from their past based on reinforcement, or what Dr. Johnson called "scaffolding." She explained that scaffolding is when a child makes a statement with very few details, and then adds more details with each successive statement. Dr. Johnson testified that additional details within scaffolding often come from a parent or other outside source. In R.P.'s case, given his language and speech delays, Dr. Johnson testified that, after she conducted several verbal memory tests, she assessed R.P. to have an impaired memory, and that he would only be able to remember events and details that had happened several years ago with some "scaffolding," coaching, or other reinforcement.

Dr. Johnson also testified that repetition is another type of reinforcement. For instance, repetition of a false statement would reinforce whether a child repeats that false statement. And Dr. Johnson testified that this is something she had observed in her sessions with R.P. Specifically, Dr. Johnson noted that R.P. repeated phrases that seemed rehearsed, and those rehearsed phrases included words that were not within his vernacular.

Based on her objective tests and assessments, Dr. Johnson concluded that R.P. "does not have a valid recall of sexual or physical abuse." (*Id.* at 0013.) She stated that there were "strong indications that [R.P.] has been coached to make absurd

statements of abuse." (*Id.* at 0013–14.) She testified that R.P. did not have the ability to recall allegations of abuse without prompting. Dr. Johnson testified that her ultimate conclusion was that she did not believe R.P.'s abuse disclosures were valid, nor did she believe that he has experienced sexual abuse.

## IV.   CONCLUSIONS OF LAW

### A.   Legal Standard

The Hague Convention, to which both Australia and the United States are signatories,[14] is an international treaty on parental kidnapping. The Hague Convention was adopted to "address the problem of international child abductions during domestic disputes." *Monasky v. Taglieri*, 589 U.S. 68, 71 (2020) (quoting *Lozano v. Montoya Alvarez*, 572 U.S. 1, 4 (2014)). Its purpose is to "secure the prompt return of children wrongfully removed to or retained in any Contracting State." Hague Convention art. 1(a), Oct. 25, 1980, T.I.A.S. No. 11670; *see Chafin v. Chafin*, 568 U.S. 165, 178 (2013). It is therefore not appropriate for a district court adjudicating a Hague petition to determine the merits of an underlying child custody claim, "but rather to restore the status quo prior to any wrongful removal or detention." *Ortiz v. Martinez*, 789 F.3d 722 (7th Cir. 2015) (quoting *Redmond v. Redmond*, 724 F.3d 729, 739 (7th Cir. 2013)); *see also Baz v. Patterson*, 100 F.4th 854, 865 (7th Cir. 2024).

---

[14] *See U.S. Hague Convention Treaty Partners*, TRAVEL.STATE.GOV: U.S. DEP'T OF STATE—BUREAU OF CONSULAR AFFAIRS, https://travel.state.gov/content/travel/en/International-Parental-Child-Abduction/abductions/hague-abduction-country-list.html (last visited July 29, 2024).

The International Child Abduction Remedies Act ("ICARA") implements the Hague Convention in the United States. *See* 22 U.S.C. § 9001; *Baz*, 100 F.4th at 864. ICARA permits a parent of a wrongfully removed or retained child to petition United States courts for the return of that child. *Baz*, 100 F.4th at 865. To determine whether a child was wrongfully removed, the court must apply a four-part inquiry: (1) when the removal occurred; (2) what the child's habitual residence was immediately before the removal; (3) whether the removal was in breach of the custody rights of the petitioning parent; and (4) whether the petitioning parent was exercising those rights at the time of removal. *Id.* at 865–66. If the petitioning parent can prove these elements, the child must be returned to his or her habitual residence unless the defendant can establish an affirmative defense. *Id.* at 865; *Blondin v. Dubois*, 189 F.3d 240, 245 (2d Cir. 1999).

One affirmative defense excuses return of the child if the alleged abducting parent shows by clear and convincing evidence that "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention art. 13(b); 22 U.S.C. § 9003(e)(2)(A); *see also Van de Sande v. Van de Sande*, 431 F.3d 567, 569 (7th Cir. 2005). Courts interpret this defense "narrowly" to promote comity between signatory countries. *Van de Sande*, 431 F.3d at 571. Because the court's duty in resolving a Hague petition is not to resolve a custody dispute itself, the risk of harm "must truly be grave." *Norinder v. Fuentes*, 657 F.3d 526, 535 (7th Cir. 2011); *see also Torres*, 2023 WL 5431352, at *8.

Determining whether a risk is grave enough "involves not only the probability of harm, but also the magnitude of the harm if the probability materializes." *Van de Sande*, 431 F.3d at 570. For example, if granting custody of a child to an allegedly abusive parent creates "some non-negligible probability [that the parent will] injure the child, the child should not be handed over, however severely the law of the parent's country might punish such behavior." *Id.* at 571. The First Circuit has explained that a "grave risk" of harm must be "a great deal more than minimal" and in making this determination a district court "must be attentive to the purposes of the Convention." *Walsh v. Walsh*, 221 F.3d 204, 218 (1st Cir. 2000). The Sixth Circuit has held that one example of a "clearly grave" risk is where there is "credible evidence of sexual abuse, other similarly grave physical or psychological abuse, death threats, or serious neglect." *Simcox v. Simcox*, 511 F.3d 594, 607–08 (6th Cir. 2007). And the Ninth and Second Circuits have stated that the "question is whether the child would suffer 'serious abuse' " if returned to the allegedly abusive parent. *Gaudin v. Remis*, 415 F.3d 1028, 1035 (9th Cir. 2005) (quoting *Blondin v. Dubois*, 238 F.3d 153, 163 n.11 (2d Cir. 2001)). At bottom, the "safety of children is [the] paramount" concern for a court tasked with determining whether a grave risk of harm exists. *Van de Sande*, 431 F.3d at 571.

Respondent raises this grave risk of harm exception as an affirmative defense to Petitioner's petition. (Dkt. 14 at 22–30.) Respondent argues that her action removing R.P. from Australia was justified by the "grave risk" exception. (*Id.* at 26.) She contends that "there exists a grave risk of danger that would expose R.P. to

psychological or physical harm if R.P. is returned to Australia and otherwise would place the child in an intolerable situation due to the Petitioner's abuse." (*Id.*)

### B. Petitioner's *Prima Facie* Case

On July 19, 2024, three days before the trial was held, the parties stipulated that Petitioner met his *prima facie* burden under ICARA and the Convention. (Dkt. 49) The parties stipulated to each of the *Baz* factors: (1) the removal occurred in April 2023 (*Id.* ¶ 4); (2) R.P.'s habitual residence is Australia (*Id.* ¶ 1); (3) Respondent's removal of R.P. was in breach of Petitioner's custody rights (*Id.* ¶ 5); and (4) Petitioner was exercising his custodial rights at the time of R.P.'s removal (*Id.* ¶ 3). Because Petitioner has met his burden under the Convention, the only issue for this Court to determine is whether Respondent has met her burden that there is clear and convincing evidence that returning R.P. to Australia would expose him to a grave risk of harm.

### C. Respondent's Affirmative Defense—Grave Risk of Harm

For the reasons that follow, the Court holds that Respondent has failed to carry her burden to establish the grave risk of harm exception by clear and convincing evidence. In sum, Respondent presented little, if any, credible evidence at trial showing that the return of R.P. to Australia would gravely threaten R.P.'s wellbeing, either due to the alleged misconduct of Petitioner or for any other reason. Although the evidence established that R.P. suffers from some developmental delay and likely needs professional treatment, that condition would pertain equally (if not worse) were R.P. to remain in the United States. Accordingly, consistent with the dictates of the

Hague Convention as implemented by ICARA, R.P. must be removed to Australia forthwith.

As explained below, neither Respondent nor the witnesses she called to testify were particularly credible. As for Respondent herself, her demeanor, bias, and the content of her testimony all significantly undermined her credibility on the facts material to this case. And the witnesses Respondent called to testify, although generally truthful on the stand, were similarly unpersuasive. Each of those witnesses based their conclusions on their observations of R.P. as informed, even tainted, by Respondent's one-sided and discredited allegations of abuse. Nor did any of those witnesses know about or review any of the records from the Australian case nor interview Petitioner. Conversely, each of Petitioner's witnesses were fully informed of everything that had happened in R.P.'s case and did not make conclusions based on either party's representations—making their conclusions significantly more credible. These findings and conclusions are explored in turn.

Respondent, bluntly put, was not a credible witness. Respondent conceded that she never witnessed Petitioner harm or touch R.P. in any way. Respondent testified that the basis of her abuse allegations was only what R.P. purportedly disclosed to her, and some changes in R.P.'s behavior that she found concerning. But Respondent offered only conjecture, not solid proof, to back up her allegations that Petitioner had abused R.P.

Underlying this finding is Respondent's obvious bias. Respondent's disdain for Petitioner was palpable during her testimony. Although the significance of this bias

should not be overstated, and must be balanced against Petitioner's own bias, it was apparent that Respondent's antipathy toward Petitioner has colored much of her view of this case. This finding is corroborated by Respondent's behavior during the hearing, in which she occasionally glared at Petitioner, made various facial and other gestures during his testimony, and generally exhibited significant hostility toward him.

Petitioner's demeanor and behavior on the stand also undermined her credibility. During her testimony, Respondent displayed an impeccable memory for those facts and events that weighed in her favor, but Respondent could not recall most of the facts or events which weighed against her. Respondent often had difficulty remembering even the most basic details of past legal proceedings, such as whether R.P. had an independent children's lawyer during the Australian Court custody proceedings. Respondent often stumbled through her testimony, misremembering her own allegations and conflicting with her deposition testimony. For instance, Respondent had testified both in her deposition and during the trial that she prepared the McHenry County protective order application by herself. But on cross-examination, when asked about a particular allegation in the application, Respondent stated that she could not remember who wrote that allegation—leading to the inference that someone else had assisted her in drafting the application. Indeed, Respondent's testimony aside, it is especially doubtful that Respondent prepared this application on her own given the precise, legalistic terminology (*e.g.,* "grave risk") that Respondent had not previously used over years of litigation.

Other instances further undermined Respondent's credibility. For example, Respondent's affect during trial at least suggested that her mental acuity is not particularly high. During one instance on cross-examination, Respondent had great difficulty locating a particular sentence on a documentary exhibit to which Petitioner's counsel was referring. This required the Court, in step by step fashion, to instruct Respondent how to locate the sentence, even though it was plainly visible on the page.

Respondent was also an evasive—and at times rote—witness. When she was examined about the Australian Court proceedings, Respondent became defensive and defiant, raising her voice and stating multiple times that the Australian proceedings were unfair. Respondent adamantly repeated that Judge Wilson was biased against her. But she was also unable to articulate exactly what was unfair and exactly why she believed Judge Wilson was biased. Respondent went so far as to lodge the dubious allegation that the Australian Magistrate Court reduced the length of time of her 2023 interim IVO from three months to one week because of certain unidentified external influences (Respondent offered no corroboration to support this allegation). Respondent also alleged that Petitioner had fabricated evidence to make her look crazy. In short, Respondent's demeanor and attitude suggested that her overarching complaint is that the Australian Court was unfair and that she should not be required to share custody of R.P. with Petitioner.

This finding as to Respondent's credibility, if not compelled by the judgment of the Australian Court, is at least corroborated by those proceedings. As explained

above, Judge Wilson harbored serious doubts as to Respondent's credibility and motivations. From everything this Court was able to discern at trial, that finding was sound.

Respondent's other evidence also failed credibly to show that Petitioner is responsible for R.P.'s sexualized behaviors and "disclosures" (an odd, legalistic word that was repeated regularly throughout Respondent's case in chief). The majority of Respondent's arguments revolve around R.P.'s alleged sexualized behaviors and changed temperament. But Respondent did not testify that R.P. told her that Petitioner sexually abused him. Respondent only testified that R.P. began doing things she found concerning: trying to put his penis in his mouth, sticking his finger in his butt, calling his penis a lollipop, asking Respondent to come get his lollipop, acting out sexual scenarios in the bath and in the air, among other things. Respondent testified that R.P.'s behavior changed: he became scared of the dark, would sometimes speak in baby talk or would become mute, wet himself occasionally, and sometimes cried and became hysterical during changeovers. Respondent also testified about R.P.'s various physical ailments, such as various rashes and marks around R.P.'s anus, and the underwear incident, where she noticed a white sticky substance coming from R.P.'s bottom. But throughout all this testimony, Respondent never stated that R.P. disclosed to her that Petitioner had done something sexual to him.

The only apparent instance where Respondent alleged that R.P. reported abuse by Petitioner is reflected in the Australian application for an Intervention Order,

when Respondent alleged that R.P. had stated that he "like[s] it when Daddy licks my penis. Daddy sniffs my penis I like it." (RX2050 at 12.) But Respondent did not discuss this disclosure in her testimony; perhaps because, as Respondent testified, there were just "too many disclosures" to remember. Regardless, it remains true that Respondent merely noticed changes in R.P. behavior and baldly concluded that those changes must have been due to sexual abuse of R.P. by Petitioner.

To be sure, R.P. reported abuse to some of his clinicians. In particular, he disclosed to Ms. Rys that Petitioner had put his finger, crayons, and a spider in R.P.'s butt; had peed in R.P.'s mouth; and Petitioner's fiancé had asked R.P. to suck her nipples. And he disclosed to Mr. Hemmer that Petitioner and Petitioner's friends wore masks and hurt his penis. But Respondent never testified about these disclosures. Nor did she mention them once in any of her applications for a protection order, or her Answer, or any other written document. It is hard for this Court to believe that Respondent could forget such serious and, quite frankly, horrendous, allegations of abuse.

To be clear, the Court is not contesting whether R.P. made those statements to Ms. Rys and Mr. Hemmer. Both witnesses testified under oath and gave no indication that they were not telling the truth, so it is highly likely that R.P. did make those disclosures to Ms. Rys and Mr. Hemmer. But the veracity of those reports is suspect, mainly due to Respondent's lack of credibility and bias and because there is no other credible evidence to support the allegations that Petitioner abused R.P.

It is, indeed, with regret that this Court must say that it cannot rule out the possibility that Respondent coached R.P. to make these execrable statements of abuse. Both DFFH and the Australian Court stated during the Australian custody proceedings that Respondent likely coached R.P. to say certain things. Perhaps Respondent has continued to do that with R.P. and his American therapists. This possibility is supported by Dr. Ortega's testimony, when he stated that R.P. seemed to anticipate questions and knew how he was going to answer them before the questions were asked, and the testimony of Dr. Johnson discussed below.

Respondent's witnesses did not help Respondent's case. Although Respondent's witnesses did not testify falsely, that only goes so far. Each witness testified that R.P. had experienced some trauma and needed treatment for that trauma. But the common thread among each of these witnesses was that they heard only one side of R.P.'s story: Respondent's. Ms. Rys, Mr. Hemmer, and Dr. Ortega conducted their therapy sessions and made assessments of R.P. based on Respondent's representations. One notable instance is Dr. Ortega's opinion, which was founded primarily on the two checklists assessing R.P.'s behavior that Respondent herself filled out.

Nor did any of Respondent's clinicians speak to Petitioner (only Ms. Rys attempted to communicate with him). Ms. Rys, Mr. Hemmer, and Dr. Ortega alike accepted R.P.'s disclosures as truth and took no action to verify Respondent's allegations against Petitioner. They simply accepted that Petitioner had abused R.P. without verification.

The perspective of these witnesses was also limited. Neither Ms. Rys nor Mr. Hemmer was aware of *any* legal proceedings in R.P.'s case, much less that an Australian judge had awarded Respondent and Petitioner with joint custody of R.P. and that Respondent had fled with R.P. to the United States. But both testified that Respondent had allegedly told them the background and history of R.P.'s case and why he needed therapy. Dr. Ortega was eventually made aware of the Australian proceedings, but only after he had completed his interviews with R.P. and prepared a preliminary report.

By contrast, each of Petitioner's witnesses did know about the Australian proceedings and were aware of the full background and history of R.P.'s case. Petitioner's first witness, Ms. Byrne—whom the Court finds to have been very credible with no apparent bias for or against either party—had worked on R.P.'s case in Australia since early 2023. Ms. Bryne is arguably more familiar with Respondent's allegations of abuse than any other witness at the trial, since she conducted investigations of Respondent's allegations. She interviewed all relevant parties, communicated with R.P.'s childcare facility and SOCIT, and was heavily involved in the circumstances of R.P.'s custody while he was in Australia. Ms. Byrne's investigation appears to have been thorough, and the Court has no concerns that DFFH and the Australian authorities overlooked or disregarded allegations in a way that deprived Respondent of any rights to raise these allegations.

Ms. Byrne knew well the allegations of abuse and the circumstances that led to DFFH's involvement in R.P.'s case and investigated them thoroughly. Yet she

found "insufficient evidence to substantiate that sexual harm has occurred." (PX40-0003.) She found no concerns for R.P.'s contact with Petitioner; to the contrary, she was concerned that Respondent was likely to cause R.P. emotional harm. And she had suspicions about Respondent's motivations for her continuous abuse reporting. With a complete picture of what was truly happening in R.P.'s case—something none of Respondent's witnesses had—Ms. Byrne did not find sufficient evidence that Petitioner was responsible for any abuse of R.P.

Petitioner's other witness, Dr. Johnson, whom the Court finds to have been a highly credible and persuasive witness, held a similar opinion that Petitioner did not abuse R.P. As with Ms. Byrne, Dr. Johnson had a more complete picture of R.P.'s case before making an assessment of R.P. She reviewed most of the documents from previous legal proceedings, and she did not rely on Respondent's (or Petitioner's) representations on what had happened to R.P. Rather, she approached her assessment of R.P. using standardized tests and objective data: methods she has used in treating hundreds of children before R.P. (as opposed to the mere handful of children Dr. Ortega has treated). Dr. Johnson relied exclusively on her observations and findings during her meetings with R.P.

Based on this objective approach, Dr. Johnson found that R.P. was not capable of remembering the things he says he remembered about Petitioner. And because of R.P.'s speech and language delay (which was not considered by any of Respondent's witnesses even though numerous Australian clinicians and Respondent herself were aware of), Dr. Johnson found that R.P.'s vernacular is limited, and many of the words

he has used in his disclosures were outside the scope of his vocabulary. She concluded that R.P. would not have been able to make the disclosures that he made without someone repeating those statements to him, or, in other words, coaching him.

Dr. Johnson's opinion is consistent with Ms. Byrne's conclusion but at odds with the conclusions of Respondent's witnesses. This Court sides with Dr. Johnson and Ms. Byrne. Those witnesses' conclusions were more credible than the conclusions of Respondent's witnesses because they were not based on either party's representations but rather on objective and comprehensive observations.

Petitioner himself testified, and credibly. Of course, as does Respondent, Petitioner has every reason to dispute the allegations made against him and to seek the return of R.P.. This means that the Court must assess Petitioner's testimony with that bias in mind. But even in the light of this bias, Petitioner presented himself as highly credible. Petitioner was not evasive in his answers, did not have a selective memory, and did not have a defensive demeanor. He answered every question clearly and evenly, making eye contact with the Court regularly, and did not make any baseless allegations. Petitioner admitted his own past misconduct forthrightly. While Respondent presented herself as be a person motivated by animus for her ex-husband (not a mother distraught by the potential abuse of her son), Petitioner presented himself as a father desperately seeking the return of his son.

It is also significant that R.P. has not seen Petitioner in sixteen months. For those sixteen months, R.P. has only interacted with Respondent. R.P. has had no other influence than Respondent, who has an exclusively negative attitudes toward

Petitioner. It is indeed possible, perhaps likely, that R.P. has been influenced by that negative attitude and has made statements about Petitioner being mean or bad not because R.P. truly remembers Petitioner as mean or bad but because, for sixteen months, R.P. has been influenced by Respondent. Moreover, it is significant that, even though R.P. was removed from Petitioner's presence and custody, R.P.'s most serious disclosures were made months after he arrived in the United States—months after he had last interacted with Petitioner.

*      *      *

In the end, based on the record developed at trial, the Court finds that Respondent has not met the "demanding standard" of proof required to establish that there would be a "grave risk" to returning R.P. to Australia. *Norinder*, 657 F.3d at 535. This means that the Court must grant the Petition and order R.P. to be returned to Australia forthwith, bearing in mind, of course, R.P.'s interests in avoiding a needlessly traumatic move.

It could go without saying that the Court makes this ruling with no small amount of regret. R.P. presents as a child in serious need of both stability and treatment; there is little doubt that his life will get harder in the short term, and that is indeed regrettable beyond measure. But if there is any accountability to be laid, it perhaps rests best at the feet of the person who chose to disregard the binding judgment of a court in R.P.'s home country and instead take matters into her own hands. It can be hoped that Respondent will make better choices in the future for R.P.'s sake.

45

## V.    CONCLUSION

For the foregoing reasons, the Court finds that Respondent has not met her burden of establishing by clear and convincing evidence the "grave risk" of harm defense under the Convention. Accordingly, the Court finds that R.P. must be returned to Australia. Petitioner's Petition for return of R.P. (Dkt. 1) is granted.

SO ORDERED in No. 23-cv-13836.

Date: August 8, 2024

JOHN F. KNESS
United States District Judge